Joel M. Mueller (SBA #029002)
**RESILIENT EMPLOYMENT LAW**
3370 N. Hayden Rd. STE 123 - 102
Scottsdale, Arizona 85251
Tel: (480) 415-5633
jmueller@resilientemploymentlaw.com
*Attorney for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Nicholas Newberry, | ) No. |
| Plaintiff, | ) |
| vs. | ) **COMPLAINT** |
| Pangborn LLC; Mark Campbell and Jane Doe Campbell; Carmella Ross and John Doe Ross; Mathew Loutzenheiser and Jane Doe Loutzenheiser. | ) |

Plaintiff Nicholas Newberry ("Mr. Newberry" or "Plaintiff"), for his Complaint against the above-named Defendants, states as follows:

**PARTIES, JURISDICTION, AND VENUE**

1.      Mr. Newberry is a resident of Maricopa County, Arizona.

2.      Defendant Pangborn LLC ("Pangborn" or "Defendant") is a Delaware limited liability company (#2082429) doing business in Maricopa County, Arizona.

3.      Defendant Mark Campbell ("CEO Campbell" or "Defendant") was Pangborn's Chief Executive Officer at all times material to this Complaint. He is named as an individual decision maker within the broad definition of "employer" under 29 USC 2611(4)(A)(ii) and may be held jointly liable with Pangborn for violations of the Family and Medical Leave Act ("FMLA") as he exercised authority and control over the terms and conditions of Mr. Newberry's employment and was personally involved in the willful decision to terminate, and not reinstate, Mr. Newberry's employment.

**4.** Defendant Carmella Ross ("V.P. Ross" or "Defendant") was Pangborn's Vice President of Human Resources at all times material to the Complaint. She is named as an individual decision maker within the broad definition of "employer" under 29 USC 2611(4)(A)(ii) and may be held jointly liable with Pangborn for violations of the FMLA. She exercised authority and control over the terms and conditions of Mr. Newberry's employment and was personally involved in the willful decision to terminate, and not reinstate, Mr. Newberry's employment.

**5.** Defendant Mathew Loutzenheiser ("V.P. Loutzenheiser" or "Defendant") was Pangborn's Vice President of Engineering at all times material to this Complaint. He is named as an individual decision maker within the broad definition of "employer" under 29 USC 2611(4)(A)(ii) and may be held jointly liable with Pangborn for violations of the FMLA. He exercised authority and control over the terms and conditions of Mr. Newberry's employment and was personally involved in the willful decision to terminate, and not reinstate, Mr. Newberry's employment

**6.** At all times material to this Complaint, Defendants, collectively, were Mr. Newberry's "employer" within the meaning of the FMLA.

**7.** John and Jane Does are named to bind the marital community, if any.

**8.** This Court has subject matter jurisdiction under 28 U.S.C. §§1331, 1343 and 29 U.S.C. § 2617(2).

**9.** The unlawful employment practices herein occurred in substantial part in Maricopa County, Arizona within the jurisdiction of the United States District Court for the District of Arizona and, at the time the unlawful employment practices occurred, Defendants were doing business therein. Therefore, venue is proper under 28 U.S.C. §1391(b).

**10.** Jurisdiction and venue are proper.

### FACTS COMMON TO ALL COUNTS

**11.** In October 2019, Mr. Newberry began working for Pangborn as its Western Regional Manager.

12. In September 2022, he applied, interviewed, and accepted a new position as a Rebuild Application Engineer.

13. In this position he worked remotely from Arizona, reporting to Manager Benjamin Brown ("Manager Brown") and V.P. Loutzenheiser at Pangborn's corporate headquarters in Fairburn, GA

14. In or around July or August 2023, Mr. Newberry experienced severe nerve pain, joint inflammation and fatigue.

15. In September 2023, Mr. Newberry's wife notified Manager Brown that Mr. Newberry was bedridden due to a suspected autoimmune disease. These immune responses were later determined to be related to a spinal condition.

16. In October and November 2023, Mr. Newberry was hospitalized on two occasions. Nonetheless, he continued to work full-time between sick days, and he kept Manager Brown informed about his health and medical treatment.

17. In early 2024, Pangborn hired V.P. Ross as its new head of HR.

18. On or around April 8, 2024, Mr. Newberry received a positive annual performance review.

19. At the end of April 2024, Mr. Newberry began to discuss medical leave with Manager Brown. He subsequently spoke with V.P. Ross about a plan to use paid benefits and then, at a later date, FMLA leave. V.P. Ross provided him with FMLA paperwork at that time "*as a formality.*"

20. On May 6, 2024, Mr. Newberry developed hypoxemia while sleeping which prompted him to contact Pangborn HR to implement the previously discussed plan to take time off. However, Pangborn made the unilateral decision to place him on FMLA leave immediately, which Mr. Newberry opposed.

21. On May 21, 2024, Mr. Newberry submitted the completed FMLA certification to V.P. Ross, stating: "*I have multiple spinal procedures that I must undergo before my recovery can commence; therefore, my tentative return is by the end of June 2024. Due to the condition of my spine and effectiveness evaluated after each procedure, the return date*

is *subject to change*. *My apologies for not getting this paperwork submitted sooner but I have not been doing well*."

22.    The Certification specified a leave start date of 5/11/24 and a "*best estimate*" return date of "*6/30/24*.

23.    On June 6, 2024, Mr. Newberry notified Manager Brown that he needed to extend his leave:

> *They isolated 3 of my vertebrae today. Two of my lumbar and one of my neck. They ordered another MRI to locate the other ones, but the surgeon said, based on the condition of those three vertebrae, I'll be lucky to get any relief from the shots today. Insurance requires two more rounds of shots before they can put me under and kill the nerves... so I'll need to extend my FMLA until the end of July and potentially into August for them to kill all of the nerves. I have round two on July 2nd and round three scheduled on July 16th. Then, I will need to preauthorize the surgery through insurance to kill the nerves, but we are finally getting some traction.*

24.    In addition to the spinal procedures, Mr. Newberry's doctor also referred him to a physical therapist for a Functional Capacity Evaluation ("FCE"). The purpose of the FCE was to assess Mr. Newberry's limitations so his doctor could determine his status for short-term disability or to return to work with an accommodation.

25.    On June 16, 2024, Mr. Newberry updated Manager Brown: "*Happy Father's Day! P.S. I have my [FCE] on July 2nd. Cara and I are calling every day to push up the injections so they can move on to surgery and kill my spinal nerves.*"

26.    On June 25, 2024, V.P. Ross emailed Mr. Newberry:

> *Hope you are recovering well and ready to return to work. Based on the FMLA documentation, we look forward to having you return to work Monday, July 1st, 2024. Can you please forward a return to work note from your attending physician outlining with or without restrictions for consideration by end of business day, eastern time, Friday June 28th. We look forward to your return - thank you.*

27.    Mr. Newberry responded: "*Good Evening, My [FCE] is on July 2nd at 0900 MST. This evaluation will determine the next steps.*"

28.    The next day, June 26, 2024, V.P. Ross replied "*Good morning, Nico. Ok, we*

*will look for the note after this doctor visit.*"

**29.** Up to this point, Mr. Newberry had been clear that his leave dates were "*estimated*" "*tentative*" and "*subject to change.*" Because the FCE would "*determine the next steps,*" and because, as he had notified Manager Brown, he had epidurals and surgery scheduled for July, after replying to V.P. Ross's June 25th email, Mr. Newberry submitted a request in Pangborn's HR and payroll system, PAYCOM, to extend his leave through July 31, 2024.

**30.** He received confirmation that the request was submitted and, a short time later, he was notified the request was approved.

**31.** Pangborn management and V.P. Ross received notification of the request through email and PAYCOM and the request was approved.

**32.** On July 1, 2024, Manager Brown asked Mr. Newberry about his treatment and Mr. Newberry responded: "*It's coming along. I'm going to see if I can come back part-time with accommodations until I get surgery for my spine. I have my [FCE] tomorrow at 0900, which took 2 months to set up.*"

**33.** Therefore, as of July 1, 2024, Mr. Newberry had: 1) told V.P. Ross that his leave dates were "*estimated*" "*tentative*" and "*subject to change*"; 2) notified Manager Brown of his need for extended leave "*until the end of July and potentially into August*"; 3) told Manager Brown, twice, about his upcoming July 2nd FCE, including that he was going to "*see if I can come back part-time with accommodations until I get surgery for my spine*"; 4) informed V.P. Ross that the July 2nd FCE would "*determine the next steps*"; and 5) obtained approval in PAYCOM for additional leave through July 31, 2024

**34.** As a result, Mr. Newberry's absences after July 2, 2024 were not "*unexcused*" nor was he a "*no show, no call.*"

**35.** Indeed, Pangborn did not communicate anything of the sort to Mr. Newberry between July 2, 2024 and July 8, 2024.  V.P. Ross's last email, on June 26th, simply states that she would "*look for the note*" following the FCE.

**36.** However, after the July 2, 2024 FCE appointment,  Mr. Newberry had to wait

for his physical therapist to complete the FCE and send it to his doctor who then had to review it to determine Mr. Newberry's return to work/accommodation status and provide a "*note*."

37.    During this period, Mr. Newberry was approved for leave through PAYCOM and continued to have multiple weeks of his 12-week FMLA leave entitlement remaining.

38.    Nonetheless, on July 9, 2024, at 7:16 P.M., V.P. Ross emailed Mr. Newberry: "*Good evening, Nico. As you shared below, your follow up appt was July 2nd at 9 am. We were hoping to hear from you by now to provide your return to work status. You were authorized to be out of medical leave through June 30th, 2024. Are you able to return to your work duties with consideration of reasonable accommodations? If so, please share by end of day tomorrow.*"

39.    Notably, V.P. Ross did not mention Pangborn's absence policy or anything about impending termination. Rather, she only obliquely referenced "*authorized*" medical leave and requested that Mr. Newberry share his return-to-work status in "*consideration of reasonable accommodations.*"

40.    Less than twenty-four (24) hours later, before Mr. Newberry read her email or had the opportunity to follow-up with his doctor about the FCE and respond about a "*reasonable accommodation,*" V.P. Ross terminated his employment.

41.    The termination email states: "*It's been 5 business days since your follow-up appointment. I've reached out via email; Ben has tried contacting you via text message and Matt and I both tried to call you twice without success. We have no other option but to terminate your employment at this time.*"

42.    At the time of his termination, Mr. Newberry was still waiting for a note from his doctor regarding his FCE and return to work/accommodation status.

43.    At the time of his termination, Mr. Newberry was approved for leave through PAYCOM and continued to have FMLA leave entitlement remaining

44.    At the time of his termination, the only attempt by V.P. Ross to "*reach out via email*" was her email less than 24 hours prior concerning Mr. Newberry's return to work

"*with consideration of reasonable accommodations*" which Mr. Newberry had not yet seen. Otherwise, she had not emailed Mr. Newberry since June 26th.

45. Manager Brown's sole text message was earlier that day asking: "*Hey brother, any news?*"

46. No one at Pangborn attempted to call Mr. Newberry's personal cell phone.

47. No one at Pangborn attempted to call Mr. Newberry's wife, his listed emergency contact.

48. On July 16, 2024, Mr. Newberry called V.P. Ross to discuss his termination. He hoped that Pangborn had made a mistake and was not deliberately looking for an opportunity to fire him. During the call, he reiterated his communications, approval through PAYCOM, remaining FMLA leave, and that no one called him on July 10, 2024.

49. Nonetheless, on July 18, 2024, Pangborn sent Mr. Newberry a letter ratifying the decision to terminate his employment: "*[t]his letter confirms your employment with Pangborn terminated effective July 10th, 2024, due to no show, no call after 5 business days.*"

50. On August 1, 2024, Mr. Newberry notified Pangborn that he was available to return to work following a successful RF surgery and second spinal epidural in July 2024. Pangborn did not respond.

## COUNT I
**FMLA (Interference)**
**29 U.S.C. § 2614(a) and 2615(a)**
**(All Defendants)**

51. Mr. Newberry incorporates by reference all previous allegations.

52. Mr. Newberry was an eligible employee under the FMLA

53. Defendants were covered under the FMLA.

54. Mr. Newberry was entitled to leave under the FMLA

55. Mr. Newberry gave sufficient notice of his intent to take FMLA leave.

56. Defendants denied Mr. Newberry FMLA benefits to which he was entitled by,

among other things, forcing him to take involuntary leave, failing to provide him with the full leave he was eligible and entitled to, and subjecting him to negative consequences as a result of his FMLA leave, including refusing to reinstate him and using his actual or attempted use of FMLA leave as a factor in the decision to terminate his employment

57. As a direct result, Mr. Newberry suffered and continues to suffer economic damages, including lost wages, loss of job benefits, increased insurance premiums, medical costs and a reduced standard of living in addition to emotional and mental distress, including worry about how he would support himself and his family while unemployed, shock from the sudden and unexpected loss of his job, anguish, humiliation, embarrassment, pain, discomfort and anxiety.

58. Defendants acted willfully thereby entitling Mr. Newberry to liquidated/double damages as authorized by 29 U.S.C. § 2617(a)(l).

59. Mr. Newberry is entitled to an award of his attorneys' fees incurred in pursuing his claims under the FMLA.

**COUNT  II**
**FMLA – Discrimination/Retaliation**
**42 U.S.C. § 2615(a)(2) and (b)**
**(All Defendants)**

60. Mr. Newberry incorporates by reference all previous allegations.

61. As alleged throughout this Complaint, Mr. Newberry engaged in protected activity, including opposing Defendants' involuntary leave designation in May 2024.

62. Defendants made the decision to terminate Mr. Newberry's employment within close proximity of his protected activity, including his opposition, and without a legitimate basis.

63. As a direct result, Mr. Newberry suffered and continues to suffer economic damages, including lost wages, loss of job benefits, increased insurance premiums, medical costs and a reduced standard of living in addition to emotional and mental distress, including worry about how he would support himself and his family while unemployed, shock from the sudden and unexpected loss of his job, anguish, humiliation, embarrassment, pain,

discomfort and anxiety.

64. Defendants acted willfully thereby entitling Mr. Newberry to liquidated/double damages as authorized by 29 U.S.C. § 2617(a)(l).

65. Mr. Newberry is entitled to an award of his attorneys' fees incurred in pursuing his claims under the FMLA

## DEMAND FOR JURY TRIAL

66. Mr. Newberry demands a jury trial.

## RELIEF REQUESTED

WHEREFORE, Mr. Newberry requests judgment and orders granting the following relief against Defendant or Defendants, jointly and severally:

A. For a declaration that Defendants' actions and practices complained of herein are unlawful;

B. For an order enjoining Defendants from engaging in the unlawful acts complained of herein;

C. For lost wages, and all other economic benefits denied or lost to Plaintiff by reason of Defendants' unlawful actions, in an amount to be proven at trial;

D. For direct and consequential damages as a result of Defendants' actions, including tort damages, in an amount to be determined as trial;

E. For liquidated damages as provided under the FMLA

F. For punitive damages (upon amendment to add ADA claims) within constitutional limits;

G. For interest on lost wages, compensation and damages, including pre- and post-judgment interest and an upward adjustment for inflation;

H. For attorneys' fees and costs of suit pursuant to the statutory actions described herein; and

I. For such other relief as this Court deems just and proper.

**Respectfully submitted** this 2nd day of April, 2026.

Page 9 of 10

RESILIENT EMPLOYMENT LAW

By: /s/ *Joel M. Mueller*
       Joel M. Mueller
       *Attorney for Plaintiff*